# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| AUSTIN WAID-JONES, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>AGILIS ENGINEERING, INC.; BELCAN ENGINEERING GROUP, LLC; CYIENT, INC.; PARAMETRIC SOLUTIONS, INC.; QUEST GLOBAL SERVICES-NA, INC.; RAYTHEON TECHNOLOGIES CORPORATION, PRATT & WHITNEY DIVISION; MAHESH PATEL; ROBERT HARVEY; HARPREET WASAN; STEVEN HOUGHTALING; TOM EDWARDS; GARY PRUS; and DOES 1-20,<br><br>        Defendants. | **CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Austin Waid-Jones ("Plaintiff"), individually and on behalf of a class of similarly situated individuals, brings this action for damages and injunctive relief under the antitrust laws of the United States against Agilis Engineering, Inc. ("Agilis"), Belcan Engineering Group, LLC ("Belcan"), Cyient, Inc. ("Cyient"), Parametric Solutions, Inc. ("PSI"), and QuEST Global Services-NA, Inc. ("QuEST") (collectively, the "Supplier Defendants"), and Raytheon Technologies Corporation, Pratt & Whitney Division ("Pratt") (together with the Supplier Defendants, the "Entity Defendants"); Mahesh Patel; Robert Harvey; Harpreet Wasan; Steven Houghtaling; Tom Edwards; Gary Prus; and Does 1-20 (collectively, the "Individual Defendants" and, together with the Entity Defendants, "Defendants").

## I.      SUMMARY OF THE ACTION

1.      Beginning in 2011 and continuing until at least 2019, six outsourcing firms and a powerful defense contractor entered into an illegal agreement (the "No Poach Agreement") not to hire one another's aerospace engineers and other skilled workers (the "Engineers").

2.      The intent and effect of the No Poach Agreement was to reduce competition for the services of Engineers, and thus to fix and suppress their salaries, benefits, and professional opportunities. Simply put, Defendants conspired to drive down the compensation they had to pay their employees, harming those individuals to enrich themselves.

3.      On December 7, 2021, federal authorities arrested Mahesh Patel, an executive at Pratt, for his role as the leader and primary enforcer of the No Poach Agreement. From 2003 until 2020, Patel led the division at Pratt responsible for retaining the Supplier Defendants to provide outsourced Engineers to work on particular projects.

4.      On December 9, 2021, the Department of Justice ("DOJ") unsealed an Affidavit in Support of Criminal Complaint and Arrest Warrant for Patel, making the details of the

conspiracy public for the first time. *United States v. Patel*, No. 3:21-mj-1189, ECF No. 15 (D. Conn. Dec. 9, 2021) (the "DOJ Affidavit").

5.      On December 15, 2021, a federal grand jury in Bridgeport, CT indicted Patel and five top executives of the Supplier Defendants for their roles in the No Poach Agreement. *United States v. Patel et al.*, No. 3:21-cr-220, ECF No. 20 (D. Conn. Dec. 15, 2021) (the "Indictment").

6.      According to the DOJ investigation, Patel and his co-conspirators put in place a series of "interwoven and overlapping hiring and recruiting restrictions" that together amounted to agreements not to poach one another's employees. These restrictions "had a common purpose—to limit competition for, and thus restrict the free movement of, victim-employees within the outsource aerospace engineering industry—and thus artificially prolonged victim-employees' tenures at their existing employers and eliminated or reduced their ability to negotiate the terms of their current or future employment." DOJ Aff. ¶12.

7.      These interwoven and overlapping restrictions included two sets of agreements, the first among the Supplier Defendants not to poach employees from one another and the second between Pratt and the Supplier Defendants that Pratt would not poach employees from the Supplier Defendants, with whom Pratt competed to employ Engineers.

8.      The No Poach Agreement was a verbal, handshake agreement. The Defendants carefully avoided reducing the agreement to writing and deliberately concealed its existence from their employees. For that reason, Plaintiff and Class Members had no means of learning about the No Poach Agreement until the DOJ Affidavit made it public on December 9, 2021.

9.      Despite these efforts to avoid memorializing the conspiracy, a handful of emails have emerged that reveal Defendants' efforts to enforce the No Poach Agreement, monitor compliance and punish defections. On the rare occasion that Supplier Defendants attempted to

break from the agreement by making job offers to their rivals' employees, Patel and his co-conspirators demanded that the deviating party rescind such offers. Indictment ¶ 26. After Patel caught one Supplier Defendant offering employment to an Engineer from a competing Supplier, the Supplier wrote to Patel, "Per our conversation yesterday, this email is to confirm that we have rescinded the offer letter for" the engineer. DOJ Aff. ¶ 33. In addition to demanding that Supplier Defendants rescind offers, Patel also enforced the No Poach Agreement by threatening to withhold work from Supplier Defendants if they failed to comply. Indictment ¶ 28(d).

10. The emails also reveal that Defendants' *express intent* in entering the No Poach Agreement was to suppress Engineers' compensation. As one Supplier Defendant wrote to another, "Mahesh says he does not want the salaries to increase." DOJ Aff. ¶ 24. Another confessed that its "general aim is NOT to recruit from the local 'competition' because no one wins; salaries rise, the workforce gets unstable, and our margins all get hurt." *Id.* ¶ 34. Patel even told Suppliers, "Please do not hire any partners [sic] employee . . . That is the only way we can pre[v]ent poaching and price war." DOJ Aff. ¶24.

11. At times, employees of Supplier Defendants raised concerns that their conspiracy was illegal—indeed, that it violated the antitrust laws. Yet the No Poach Agreement remained in place for at least eight years.

12. Defendants' agreements unreasonably restrained trade and are *per se* unlawful under federal law. Plaintiff brings this class action on behalf of a class of similarly situated individuals for damages and injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## II.    JURISDICTION AND VENUE

13. Plaintiff brings this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to recover damages suffered by Plaintiff and the Class and to secure equitable and

injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiff and the Class also seek attorneys' fees, costs, and other expenses under federal law.

14.     This Court has jurisdiction over the subject matter of this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1) and 28 U.S. §§ 1331 and 1337.

15.     Defendants are subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their substantial contacts with the State of Connecticut, including contacts in furtherance of the conspiracy alleged herein.

16.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and Defendants reside in, are doing business in, or transact business in this District.

III.    **THE PARTIES**

17.     **Plaintiff Austin Waid-Jones** is a citizen and resident of the state of Massachusetts. Mr. Waid-Jones was employed as an Engineer for Defendant QuEST from 2015 to 2018. Mr. Waid-Jones was injured in his business or property by reason of the violations alleged herein.

18.     On information and belief, **Defendant Pratt** is identified as Company A in the DOJ Affidavit. *See* DOJ Affidavit ¶ 5. A division of Raytheon Technologies Corporation, Pratt describes itself as "a world leader in the design, manufacture and service of aircraft engines and auxiliary power units." Pratt has over 39,000 employees, including thousands of Engineers. In addition to employing Engineers itself, Pratt also hires Engineers through outsourcing companies like the Supplier Defendants. In an outsource arrangement, Pratt pays a company like one of the

Supplier Defendants to provide Engineers to complete a particular project subject to a statement of work. DOJ Aff. ¶ 5. In other words, Pratt is both a competitor of the Supplier Defendants in the market for the services of Engineers, as well as a major customer of Supplier Defendants' services.

19.     On information and belief, **Defendant QuEST** is identified as Company B in the DOJ Affidavit. *See Id.* ¶ 6(a). QuEST is an Ohio corporation with a principal place of business in East Hartford, CT. *Id.* QuEST competes with Pratt and the other Supplier Defendants to employ Engineers. On information and belief, at times during the relevant period, Pratt has retained QuEST to supply Engineers to work on projects for Pratt. QuEST competes with the other Supplier Defendants for business from aerospace manufacturers such as Pratt.

20.     On information and belief, **Defendant Belcan** is identified as Company C in the DOJ Affidavit. *See Id.* ¶ 6(b). Belcan is an Ohio corporation with a principal place of business in Windsor, CT. *Id.* Belcan competes with Pratt and the other Supplier Defendants to employ Engineers. On information and belief, at times during the relevant period, Pratt has retained Belcan to supply Engineers to work on projects for Pratt. Belcan competes with the other Supplier Defendants for business from aerospace manufacturers such as Pratt.

21.     On information and belief, **Defendant Cyient** is identified as Company D in the DOJ Affidavit. *See Id.* ¶ 6(c). Cyient, formerly known as Infotech Enterprises Limited, is a California corporation with a principal place of business in East Hartford, CT. *Id.* Cyient competes with Pratt and the other Supplier Defendants to employ Engineers. On information and belief, at times during the relevant period, Pratt has retained Cyient to supply Engineers to work on projects for Pratt. Cyient competes with the other Supplier Defendants for business from aerospace manufacturers such as Pratt.

22.     On information and belief, **Defendant PSI** is identified as Company E in the DOJ Affidavit. See *Id.* ¶ 6(d). PSI is a Florida corporation with offices in Jupiter, FL. *Id.* PSI competes with Pratt and the other Supplier Defendants to employ Engineers. On information and belief, at times during the relevant period, Pratt has retained PSI to supply Engineers to work on projects for Pratt. PSI competes with the other Supplier Defendants for business from aerospace manufacturers such as Pratt.

23.     On information and belief, **Defendant Agilis** is identified as Company F in the DOJ Indictment. *See Id.* ¶ 6(e). Agilis is a Florida corporation with a principal place of business in Palm Beach Gardens, FL. *Id.* Agilis competes with Pratt and the other Supplier Defendants to employ Engineers. On information and belief, at times during the relevant period, Pratt has retained Agilis to supply Engineers to work on projects for Pratt. Agilis competes with the other Supplier Defendants for business from aerospace manufacturers such as Pratt.

24.     On information and belief, **Defendant Mahesh Patel** served as a leader and primary enforcer of the conspiratorial agreement, as well as an intermediary for communications between co-conspirators. Indictment ¶ 22. Patel was the Manager and (later) Director of the unit within Pratt in charge of managing the relationships between Pratt and its Suppliers. *Id.* ¶ 10. Within that unit, he was the highest-ranking employee and managed a team of associates from his office in East Hartford, CT. *Id.* Patel and his associates communicated frequently with representatives of the Suppliers, controlled the statements of work and payments for Supplier projects, and monitored the quality of Supplier work and progress on their projects for Pratt. *Id.* Patel was also involved in master contract negotiations between Suppliers and Pratt's parent company, Raytheon, which provided for maximum pricing charged by each Supplier to Pratt for the completion of outsourced projects. *Id.*

25.    On information and belief, **Defendant Robert Harvey** is identified as Co-Conspirator 1 in the DOJ Affidavit. DOJ Aff. ¶8(a). Harvey was employed by Defendant QuEST beginning in or around 2010 as Senior Vice President, then President-Strategic Accounts, and, as of 2019, President-Global Business Head. Indictment ¶ 11. He worked principally from an office in East Hartford, CT. *Id.*

26.    On information and belief, **Defendant Harpreet Wasan** is identified as Co-Conspirator 3 in the DOJ Affidavit. DOJ Aff. ¶ 8(c). Wasan was Vice President and Strategic Client Partner of Defendant QuEST beginning in or around early 2015. Indictment ¶ 12. He worked principally from offices in East Hartford, CT and Tokyo, Japan. *Id.*

27.    On information and belief, **Defendant Steven Houghtaling** is identified as Co-Conspirator 5 in the DOJ Affidavit. DOJ Aff. ¶ 8(e). Houghtaling was employed by Defendant Belcan beginning in or around early 2013 as a General Manager, Vice President, and, as of 2019, Senior Vice President. Indictment ¶ 13. He worked principally from an office in Windsor, CT. *Id.*

28.    On information and belief, **Defendant Tom Edwards** is identified as Co-Conspirator 6 in the DOJ Affidavit. DOJ Aff. ¶ 8(f). Edwards was employed by Defendant Cyient beginning in or around 2010, and, as of in or around 2013, has been President of Cyient's North America operations. Indictment ¶ 14. He worked principally from an office in East Hartford, CT. *Id.*

29.    On information and belief, **Defendant Gary Prus** is identified as Co-Conspirator 7 in the DOJ Affidavit. DOJ Aff. ¶ 8(g). Prus was Chief Operating Officer/Executive Vice President and part owner of Defendant PSI, beginning at least as early as 2015. Indictment ¶ 15. He worked principally from an office in Jupiter, FL. *Id.*

30.     Plaintiff alleges on information and belief that DOES 1-20, inclusive, were co-conspirators with other Defendants in the violations alleged in this Complaint and performed acts and made statements in furtherance thereof. DOES 1-20 are residents of the State of Connecticut and are corporate officers, members of the boards of directors or otherwise senior officials of Defendants with decision-making authority. Plaintiff will amend this Complaint to allege the true names of the Doe defendants when it is able to ascertain them.

31.     The following chart summarizes the Entity Defendants:

| DOJ Identifier | Company Name |
|---|---|
| Company A | Pratt & Whitney |
| Company B | QuEST |
| Company C | Belcan |
| Company D | Cyient |
| Company E | PSI |
| Company F | Agilis |

32.     The following chart summarizes the Individual Defendants:

| DOJ Identifier | Name | Affiliation |
|---|---|---|
| *N/A* | Mahesh Patel | Pratt & Whitney |
| Co-Conspirator 1 | Robert Harvey | QuEST |
| Co-Conspirator 3 | Harpreet Wasan | QuEST |
| Co-Conspirator 5 | Steven Houghtaling | Belcan |
| Co-Conspirator 6 | Tom Edwards | Cyient |
| Co-Conspirator 7 | Gary Prus | PSI |

## IV.     FACTUAL ALLEGATIONS

### A.     Trade and Commerce

33.     Throughout the relevant period, Defendants employed engineers and other skilled workers in Connecticut, Vermont, Massachusetts, Illinois, Ohio, Georgia and Florida, including in this District. DOJ Aff. ¶ 55. The No Poach Agreement restricted interstate movement of workers between and among those various states. *Id.*

34.     As a result, the No Poach Agreement has substantially affected interstate commerce and caused antitrust injury throughout the United States.

**B.      The Market for Aerospace Engineering Services in the United States**

35.     According to the DOJ and the Federal Trade Commission ("FTC"), "[n]aked wage-fixing or no-poaching agreements among employers," like the No Poach Agreement here, "are per se illegal under the antitrust laws." As such, there is no requirement to define the relevant product or geographic markets.

36.     But to the extent such definitions are necessary, the relevant market is the market for the services of aerospace Engineers in the United States and its territories.

**1.      The Relevant Product Market**

37.     Aerospace engineers work in a variety of roles related to the design, manufacture and testing of aircraft, spacecraft, satellites, and missiles.

38.     The United States Bureau for Labor Statistics estimates that approximately 60,000 people work as aerospace engineers in the United States. The median annual wage is $118,610.

39.     Aerospace workers are in high demand. There are 4,000 openings annually and some reports indicate that there is a shortage of qualified individuals to fill these positions, as an older generation of engineers heads towards retirement.

40.     Working in the field requires extensive training, including undergraduate and/or graduate degrees in engineering. As some projects in the field relate to national defense, Engineers may also be required to secure a security clearance. Some roles may require Engineers to have professional certifications, which they can receive by passing exams such as the Fundamentals of Engineering exam, Principles and Practice of Engineering exam, or Professional Engineering exam. Engineers often develop specialties in areas such as

aerodynamics, thermodynamics, materials, celestial mechanics, flight mechanics, propulsion, acoustics, and guidance and control systems.

41.     Current job openings that Defendants have posted confirm the nature and extent of the qualifications necessary to pursue employment in the aerospace field.

42.     Pratt currently has 917 openings for Engineers, including 538 in Connecticut alone. One such opening is for a Senior Engineer for Design Engineering in East Hartford, CT. Qualifications include a bachelor's degree in mechanical or aerospace engineering and five or more years of experience in the design, development and manufacturing of aerospace gear systems; "US Citizenship due to government contracts"; and "ability to obtain and maintain a government secret clearance."

43.     Belcan is currently seeking a Senior Test Technician in Cedar Rapids, IA. Qualifications include a bachelor's degree in a Science, Technology, Engineering or Math (STEM) discipline; U.S. citizenship; and 6-10 years of experience with multiple computer programming languages and technical instruments such as oscilloscopes. *Id.* Notably, "[c]andidate must have the ability to obtain a US [Department of Defense] Security Clearance."

44.     Cyient is currently seeking an Aerostructures Stress Analyst in East Hartford, CT. Qualifications include experience with engineering software, 12 years of aircraft-stress analysis, and U.S. citizenship, with security clearance "preferred but not required."

45.     PSI is currently seeking Engineers in Jupiter, FL. Qualifications include a bachelor's degree in mechanical engineering or aerospace engineering; five or more years of experience in an engineering services environment or related field; and experience with finite element analysis and CAD modeling. U.S. citizenship is required.

46.     Agilis is currently seeking a Mechanical Design Engineer in Palm Beach Gardens, FL. Qualifications include a bachelor's degree in mechanical or aerospace engineering, "strong knowledge" of computer-aided design software and "ability to obtain and maintain a United States Security Clearance."

47.     QuEST is currently seeking a Team-Project Leader/Design Engineer in Indianapolis, IN. Qualifications include a bachelor's degree in mechanical engineering, experience with aero/industrial gas turbines and water jet propulsion systems, ability to obtain and retain a QuEST Project Management Certification, and "deep knowledge" of engineering software design tools.

48.     Aerospace engineers may work directly for aerospace firms like Pratt, or may be employed by outsourcing companies like the Supplier Defendants. In the market for aerospace engineers' labor, companies like Defendants are buyers, and Engineers—including Plaintiff and Class members—are sellers.

49.     While Pratt and the Supplier Defendants compete with one another to employ Engineers, the Supplier Defendants also compete with one another for contracts with Pratt. Of course, one of the key considerations Pratt must make in selecting an outsourcing firm to work with is price—and, as the DOJ explains, "a Supplier's rate for its work on a particular [Pratt] project was based primarily on per-hour prices for the labor to be performed by the Supplier's employees." DOJ Aff. ¶ 10.

### 2.     The Relevant Geographic Market

50.     The relevant geographic market is the United States and its territories, because positions as aerospace engineers in other countries are not reasonably substitutable with positions in the United States.

51.     Barriers to aerospace engineers emigrating for purposes of employment include the need to secure employment visas; language barriers; and the costs of moving their families.

52.     The sensitive nature of the work that aerospace engineers do requires it to be done in the United States. Aerospace engineering manufacturers, including Pratt, develop aircraft components for both civilian and military uses. When it comes to military projects, procurement policies or rules may require that the work be done in the United States, by U.S. citizens, and/or by individuals with security clearances. As noted above, many job openings for aerospace engineers require that they be United States citizens with the ability to obtain security clearances.

53.     While manufacturers in other industries may be able to outsource production to other parts of the globe, that is not an option for employers in the aerospace sector. Likewise, finding employment in other countries is not an option for many Engineers.

**C.     Defendants Have Market Power in the Relevant Market**

54.     Among them, Defendants exert market power over the market for aerospace Engineers in the United States.

55.     Through their collusive agreement, Defendants have the ability to fix and suppress the compensation they pay to Engineers, without risking the loss of so many Engineers that it would defeat the profitability of the scheme.

56.     Because Defendants' ability to fix prices is direct evidence of their market power, it is not necessary to allege market power through indirect evidence, such as Defendants' shares of the relevant market for Engineers' services. In all events, information about the Defendants' market shares may emerge in the course of discovery, but is currently solely in their possession, custody or control.

### D.     The No Poach Agreement

57.     From at least 2011 until at least 2019, Defendants and their co-conspirators engaged in a multi-pronged conspiracy to suppress Engineers' compensation by refusing to compete for their services.

58.     At a high level, Pratt both agreed with Suppliers not to recruit or hire each other's employees, and also enforced the agreement among the Supplier Defendants.

### 1.     The Conspiracy Among Supplier Defendants

59.     Beginning as early as 2011, the Supplier Defendants agreed not to contact, interview, recruit or hire candidates from one another.

60.     Patel served as a leader and primary enforcer of the No Poach Agreement, as well as an intermediary for communications among co-conspirators, due to his position and influence at Pratt, a common customer of the Supplier Defendants. Indictment ¶ 22.

### a.     Patel Explicitly Instructed Supplier Defendants Not to Hire One Another's Employees and Reprimanded Conspirators for Deviating From the Agreement

61.     In or around December 2015, Patel attended a dinner with individuals from QuEST, Belcan and Cyient, including Defendants Edwards and Wasan. Indictment ¶22(a). After the dinner, a Belcan employee emailed Defendant Houghtaling to summarize Patel's instructions to the group: "Mahesh did take the stage at the end . . . no poaching of others' [sic] employees." *Id.*

62.     Most of the time, Pratt and the Supplier Defendants abided by their agreement not to recruit or hire one another's employees. But on the rare occasions that a supplier was bold enough to try to hire from a rival, Patel heard about it and quickly moved to shut it down—or issued warnings about the repercussions that would follow.

63.    In or around February 2015, after Cyient hired an employee of QuEST, Cyient's Edwards informed a colleague that he would be reporting it to Patel: "I let Mahesh know that this happened—[a]nd we are still looking into how exactly this happened." Indictment ¶ 25(c). Edwards adds, "can you let Mahesh know the actions we're taking to prevent this from happening again?" *Id.*

64.    In or around May 2016, Houghtaling learned that PSI poached one of Belcan's employees. Indictment ¶ 22(c). A colleague asked Houghtaling, "Did you ever discuss the last one with Mahesh?" *Id.* To which he responded, "Yes, he said he'd talk to [PSI] about it." *Id.* Houghtaling also followed up with Patel to complain that Belcan was "losing another employee to [PSI]."

65.    In September 2016, Belcan informed Patel that PSI had poached one of its employees. DOJ Aff. ¶ 31. Patel emailed PSI founder Prus to say, "You had assured me that [PSI] will never soliciting [sic] [Pratt]'s long term partners [sic] employees . . . Please send me in writing that proper steps has [sic] taken place to curtail this practice. *Id.* Prus told his employee, "[p]lease stop speaking to any [Belcan] or other [Pratt] supplier companies about transitioning to a [PSI] office immediately." *Id.* The employee responded, "[c]onsider it done." *Id.*

66.    In or around November 2016, Prus emailed Patel to inform him of "[Belcan] actively [r]ecruiting [PSI] employees." Indictment ¶22(d). Patel forwarded the email to Belcan executives, including Houghtaling, to say, "[w]e must not poach each other [sic] partners [sic] employee [sic]. Please communicate to [Belcan] HR not to interview or hire active employees working on [Pratt] work." *Id.*

67.    In or around January 2017, a Cyient executive emailed Patel to complain about "[PSI] stealing our people," citing a Cyient employee who had recently been offered

employment by PSI. Indictment ¶25(b). Patel forwarded the email to Prus, adding: "Last time we talked you assured me that you will not hire any [Pratt] partners employee [sic]. This must stop, otherwise others will also start poaching your employees." *Id.* Prus forwarded the email to his HR department and said, "Please make sure we stay away from [Belcan], [Cyient], [Agilis] personnel moving forward." *Id.*

68.     In or around February 2017, after Belcan made an offer to a QuEST engineer, Wasan sent an email complaining, "[Belcan] is not allowed to poach any of our employees and I will plan to block this immediately. I will send this to Mahesh today." DOJ Aff. ¶28. He did so just four minutes later, forwarding the information to Patel and stating, "I am very concerned that [Belcan] believes they can hire any of our employees . . . Could you please stop this person from being hired by [Belcan]?" *Id.*

69.     At times, the Supplier Defendants enforced the agreement themselves.

70.     In November 2016, Prus complained to one of his employees about poaching by Belcan. He wrote, "[n]eed to have a conversation with [a Belcan manager] about them actively recruiting [PSI] employees. We do not EVER call their employees." Indictment ¶ 28(g). The other PSI employee responded, "I talked to him. He will talk to recruiting. . . ." *Id.*

71.     In September 2019, Cyient's Edwards emailed the founder and CEO of Agilis to demand that his company stop "actively recruiting" Cyient employees. DOJ Aff. ¶ 34. The Agilis CEO agreed, responding that Agilis's "general aim is NOT to recruit from the local 'competition' because no one wins; salaries rise, the workforce get [sic] unstable, and our margins all get hurt." *Id.* Edwards thanked the Agilis CEO, adding, "I flat out ask our teams not [to] hire people from other [Pratt] suppliers." *Id.*

**b.**     **Suppliers Who Deviated From the No Poach Agreement
Risked Retaliation, Including Loss of Pratt Business**

72.     Defendants engaged in a number of methods to monitor and enforce compliance
with the No Poach Agreement, including by investigating whether employees were seeking
employment elsewhere; alerting co-conspirators to such actions; demanding that they cease and
desist; and demanding that rivals rescind offers they had already made. Indictment ¶28(a)-(c).
Patel even threatened to withhold Pratt's business from Supplier Defendants if they deviated
from the conspiracy. Indictment ¶28(d).

73.     In or around December 2017, a QuEST executive emailed Houghtaling to
complain about Belcan's offer to a QuEST Engineer in Illinois, stating, "I would like to
understand if you are planning to address this immediately, or I will be forced to escalate to our
mutual customers." Indictment ¶28(f). QuEST's Harvey responded, "Spot on. This cannot be
tolerated! We need to move quickly and forcibly when this is about to happen." *Id.* Later, Harvey
followed up internally with others at QuEST, stating, "[p]ush hard to have it reversed and
consequences for [Belcan]." *Id.*

74.     In June 2018, QuEST complained to Patel that Belcan had tried to poach one of
QuEST's engineers. DOJ Aff. ¶ 33. A Belcan recruiter explained in an internal email, "[QuEST]
complained to [Pratt] that we are 'stealing' their people, and *[Pratt] threatened to pull all
[purchase orders]* from [Belcan] if we hire him." *Id.* (emphasis added). A day later, a Belcan
employee emailed Patel and said: "Per our conversation yesterday, this email is to confirm that
we have rescinded the offer letter." *Id.*

c.      **The Defendants Recognized Their Shared Interest in Suppressing Engineer Compensation**

75.     Patel conveyed to the Supplier Defendants that failing to abide by the No Poach Agreement would hurt them all, and the Suppliers got the message. In March 2016, Prus wrote to another supplier to say, "Mahesh says he does not want the salaries to increase." DOJ Aff. ¶ 24.

76.     In January 2017, after PSI poached an employee from Cyient, Patel wrote to PSI to say, "Please do not hire any partners employee, whether they approached or you approached. That is the only way we can pre[v]ent poaching and price war." DOJ Aff. ¶ 24.

77.     In April 2017, after Cyient hired an employee from QuEST, a QuEST executive complained to Patel, "[t]his is against our agreements with our employees and against our known expectations of [Pratt] for the cooperation of the outsource companies," warning that if such hiring does not stop, it will "drive the price structure up." DOJ Aff. ¶ 25. Patel followed up by hauling executives from Cyient and QuEST into his office for a "private discussion" the very next day. *Id.*

2.      **Pratt Agreed Not to Hire From Supplier Defendant QuEST**

78.     In addition to facilitating the conspiracy among the Supplier Defendants, Pratt agreed not to hire QuEST employees for its in-house labor force. Indictment ¶ 23.

79.     In September 2011, QuEST executive Harvey had dinner with Patel and others from Pratt to discuss an agreement that Pratt would not hire QuEST employees until they had spent a minimum of two years at QuEST. Indictment ¶ 24(a). Harvey followed up the next day via email, summarizing their discussion of "the new policy/guidelines" to apply to "personnel transfers"—namely, "min. 24 months," i.e., an Engineer must spend two years at QuEST before Pratt could try to hire him/her. *Id.* At Patel's direction, Harvey kept the email deliberately vague

in order to conceal the conspiracy: "Following Mahesh's previous counsel, I am not going into detail in writing on this subject." DOJ Aff. ¶ 42.

80.     In the wake of that dinner, Patel, Harvey, and others were in regular communication to reconfirm, maintain and enforce this agreement, including by blocking the recruitment or hiring of particular QuEST Engineers. DOJ Aff. ¶ 43.

81.     In October 2012, a QuEST employee wrote to Patel to object to a particular Pratt hire: "[Employee]'s tenure at [QuEST] dates to May 2011. Based on our agreement of two year minimum tenure, we would ask that [Pratt] not pursue employment of [him] at this time." DOJ Aff. ¶ 44.

82.     In June 2015, Patel sought "concurrence" from QuEST to hire two of its engineers. DOJ Aff. ¶45. QuEST responded that one had worked at QuEST for four and a half years and thus "meets requirements," but the other "only has 8 months and does not meet obligation, so [QuEST] cannot provide concurrence." DOJ Aff. ¶ 45.

83.     In or around January 2016, QuEST executive Wasan wrote to a colleague, "I am planning to meet with Mahesh later this week to discuss the hiring matrix I developed to limit the hiring. Also I am going to tell him that he needs to block" two QuEST engineers "from being hired until we come to an agreement on the acceptable limit to hire [from] our team." Indictment ¶ 23(a).

84.     In or around July 2016, Wasan emailed Patel to dissuade him from hiring a QuEST employee, writing, "we cannot lose him" and complaining that "[Pratt] keeps poaching this team." Indictment ¶ 23(b). Patel followed up with his colleagues on Pratt's HR team, writing, "I checked with [QuEST], [t]hey absolutely do not want to release [the employee]. Please do not extend offer to him. [Pratt] has committed to [QuEST] that we will not hire any

more of their employees this year in 2016." *Id.* (emphasis original). Patel forwarded this

exchange to Wasan, who expressed his gratitude. *Id.*

85.     In or around April 2017, a QuEST manager quashed an attempt by Pratt to hire

away a QuEST engineer because he "wouldn't meet our requirements for two years," i.e., "does

not meet tenure requirements." Indictment ¶ 24(b). Patel told his colleagues in Pratt HR to back

off, writing, "[QuEST] will not release him . . . He has not completed 2 [y]ears as [sic] our verbal

agreements." *Id.*

### a.     Pratt Agreed to Absolute Hiring Freezes and Moratoria

*86.*     In addition to the two-year minimum tenure requirement, from 2015 to 2017, Pratt

agreed to months-long periods during which it agreed not to recruit QuEST employees—

essentially granting QuEST a right to veto any hire that Pratt wanted to make.

*87.*     In September 2015, Patel sought "concurrence" from QuEST for Pratt to hire two

of its engineers. DOJ Aff. ¶48. QuEST's Wasan responded that even though these two

employees "have at least two years" of experience at QuEST and thus "meet the 'handshake

agreement' level," he nonetheless objected: "[QuEST] will not be able to concur with any more

hiring of [QuEST] employees this year . . . All we can do is highlight the problem and ask that

[Pratt] support us going forward to prevent further hiring of our resources." *Id.* Wasan later

followed up with Patel to add, "Mahesh, we truly need your help in blocking these two hires and

putting a moratorium on [QuEST] hires for the remainder of the year." *Id.*

88.     Patel then served as the messenger to convey these hiring freezes to the rest of the

team at Pratt. In or around September 2017, Patel emailed a Pratt HR executive to say, "direct

your HR team not to hire [QuEST] outsource resources currently deployed on [Pratt] projects till

end of this year. . . . [QuEST] senior leadership including CEO has repeatedly raised concerns on

[Pratt] hiring [QuEST] employees. We will lift [QuEST] hiring restriction from Jan. 1, 2018."
DOJ Aff. ¶ 50.

> **b.      The Tenure Restrictions and Hiring Freezes Enabled Pratt and QuEST to Avoid Pressure to Raise Engineer Compensation**

89.     QuEST found itself in a Catch-22: it struggled to offer salaries high enough to retain its Engineers while simultaneously keeping its prices low enough to continue securing business from Pratt. DOJ Aff. ¶ 51.

90.     The No Poach Agreement with Pratt resolved this conundrum. It enabled QuEST to keep its Engineers from leaving—because, unbeknownst to them, QuEST exercised a veto over their right to freely seek employment—while suppressing the labor costs it billed to Pratt.

91.     QuEST spelled out this rationale to Pratt. In June 2017, Harvey proposed to Pratt's parent company, Raytheon, that the companies develop a "partnership approach on how we can minimize bill rate increases necessary to hire and retain resources needed to provide the desired services to" Raytheon. DOJ Aff. ¶ 52. Harvey attached a presentation to that email, explicitly recommending further hiring restrictions because "[w]e have found that customer hiring of our resources puts pressure on [QuEST]'s and our customers' ability to contain labor cost increases in our joint 'ecosystem' over time." Id.

92.     Pratt and QuEST benefitted from this arrangement, to the detriment of their employees.

> **3.      Defendants Recognized That Their Conduct Violated the Antitrust Laws, But Did Not Stop**

93.     In January 2016, Defendant Houghtaling received an email regarding a civil lawsuit accusing several large companies of "engaging in illegal anti-poaching agreements . . . the companies involved had promised each other not to actively recruit employees from one another" (DOJ Aff. ¶35), an apparent reference to *In Re: High-Tech Employee Antitrust Litig.*,

Case No. 11-cv-2509 (N.D. Cal.). Houghtaling followed up by planning a meeting with Patel that included the agenda item, "Informal poaching agreement between outsource suppliers. Recent Apple lawsuit because these agreements are illegal." *Id.* ¶ 36.

94.    In January 2017, Houghtaling discussed the issue with Belcan's HR Director, who expressed concern that "there is an anti-trust issue by us turning people away solely based on their previous employer." *Id.* ¶37. Houghtaling expressed concern also, stating, "[Pratt] (Mahesh Patel) is asking (insisting) that we not interview anyone currently employed by our competitors . . . I'm not sure if this is legal, but that is what they are requesting we do." *Id.* The next day, the HR Director reported that she "spoke with Mahesh this afternoon. He understands our concern with antitrust compliance, however, he still requested that our recruiters not speak with applicants who are current[ly] employed with [Belcan] competitors." *Id.*

95.    In other words, Defendants knew that their conspiracy not to recruit one another's employees was against the law. They proceeded with it anyway.

96.    Two weeks later, a Belcan employee included on these exchanges emailed Houghtaling and others to draw their attention to another no-poach lawsuit alleging a conspiracy among competitors who had agreed to "restrict[] recruiting of each other's employees." *Id.* ¶38.

### E.    Plus Factors Render the Market for Aerospace Engineers Particularly Susceptible to Collusion

97.    The following characteristics of the market for Engineers make that market particularly susceptible to collusion.

### 1.    Ongoing Government Investigation

98.    Defendants' No Poach Agreement might never have come to light were it not for the DOJ investigation into their hiring practices.

99.     Courts routinely recognize that a government investigation—particularly a criminal investigation that has led to indictments—supports the plausibility of allegations in a civil antitrust complaint.

100.     Here, the federal government has indicted six individuals for their roles in the No Poach Agreement. That strongly supports this complaint.

### 2.     Opportunities to Conspire

101.     As the above allegations make clear, Defendants were in frequent communication with one another regarding the creation, maintenance, monitoring and enforcement of the No Poach Agreement. Even aside from those meetings and discussions, Defendants had frequent opportunities to conspire through their participation in trade associations and ongoing business relationships.

102.     The Aerospace Industries Association ("AIA") is the premier trade association in the aerospace sector. At various points during the Class Period, executives of Pratt and Belcan have been members of the AIA's Executive Committee.

103.     Pratt hosts a Supplier Summit every year, at which it delivers awards to Suppliers. Supplier Defendants routinely receive awards at this summit, often for successful efforts to reduce costs.

104.     Belcan won the 2017 Supplier Productivity Innovation Award for, among other things, saving Pratt $4.9 million in costs. In a press release announcing the award, Patel praised Belcan for its "value-added innovations." *Id.*



*Executives of Belcan and Pratt, including Mahesh Patel, at the 2017 awards ceremony.*

105.    Belcan also won the 2018 Supplier Productivity Innovation Award "based on Belcan's . . . 15 productivity improvements and three cost avoidances." Houghtaling boasted about Belcan's success in helping Pratt "reduc[e] their overall cost." *Id.*

106.    In 2019, Cyient won the Supplier Innovation Award for the seventh consecutive year and the Supplier Highest Productivity Award for the fourth consecutive year. The press release announcing the awards indicated that Pratt was rewarding Cyient for "multi-million dollars in cost savings that were realized through several supplier saving proposals." *Id.*



*Executives of Belcan and Pratt, including Mahesh Patel, at the 2019 awards ceremony*

107.    In short, Pratt routinely rewarded the Supplier Defendants for reducing costs. Because the rates that Suppliers charge to Pratt are "based primarily on per-hour prices for the

labor to be performed by the Supplier's employees" (*see* DOJ Aff. ¶10), Pratt was essentially rewarding Supplier Defendants for reducing Engineer compensation.

### 3.    High Entry and Exit Barriers

108.    Another factor that makes the market for Engineers' services susceptible to collusion is that there are high barriers for Suppliers to enter the market for providing such services, as well as high barriers for Engineers seeking to exit the market and sell their services elsewhere.

109.    There exist only a handful of aerospace manufacturers in the world as large and powerful as Pratt. Selling aerospace engineering services to the federal government and others is highly complex, requiring companies marshal not only an extraordinary level of technical expertise but also that they navigate a thicket of laws, procurement policies and security clearances. There are high barriers to entering this market.

110.    Likewise, there are high barriers to entering the market for outsourcing businesses like that of the Supplier Defendants. This business requires technical expertise, an understanding of the skills and qualifications required to meet manufacturers' outsourcing needs, the ability and resources to identify, vet, recruit and retain qualified candidates, and development and maintenance of relationships with the manufacturers.

111.    In addition to the entry barriers for employers, the market for Engineers' services is also susceptible to collusion because Engineers face high barriers to exit the market. In order to pursue a career in this field, Engineers make substantial investments of time and money in securing the appropriate education, training, professional certifications and, in some cases, security clearances. Successful careers in this field require a high degree of specialization, which skills are not readily transferable to other engineering fields.

112.     Further, as noted above, Engineers can not readily transfer their skills to markets outside the United States.

113.     The difficulty of new Suppliers entering the market, combined with the difficulty Engineers face in seeking work with employers other than Defendants', makes the No Poach Agreement more plausible and easier to enforce.

### 4.     Motive to Conspire

114.     The Defendants shared a common motive to conspire to suppress compensation for Engineers.

115.     As the DOJ explained,

> [i]ncreases in labor costs due to increased wages or benefits to engineers and other skilled workers affected both the [Supplier Defendants] and [Pratt]. If a [Supplier Defendant] increased wages or benefits, including as a means of attracting and retaining workers, that Supplier's total labor costs increased. This resulting increase in labor costs may have financially motivated the Supplier to quote or seek to charge higher prices (or 'rates') to [Pratt], given that a Supplier's rate for its work on a particular Company A project was based primarily on per-hour prices for the labor to be performed by the Supplier's employees. Labor costs were thus closely monitored by each of the Suppliers and by PATEL on behalf of [Pratt]; [Defendants] each had an interest in minimizing or reducing labor cost increases.

DOJ Aff. ¶ 10.

116.     The Defendants recognized that it was in their mutual interest to suppress employer compensation. As one Supplier Defendant executive put it, its "general aim is NOT to recruit from the local 'competition' because no one wins; salaries rise, the workforce gets unstable, and our margins all get hurt." *Id.* ¶ 34.

### 5.     Actions Against Self Interest

117.     As noted above, there is a shortage of qualified individuals to fill the 4,000 positions for aerospace engineers that open up every year.

118.    The AIA reports that, "the industry faces impending retirements and a shortage of trained technical graduates, which is a situation that is forecasted to worsen within the decade."

119.    If Defendants were actually competing in a free market for Engineers' labor, they would be required to increase salary, benefits, and other forms of compensation in an effort to entice workers. Having a stronger workforce would be in each Defendant's interest because leaving positions unfilled also comes at a cost, including increased recruiting costs to identify and attract candidates, as well as training and relocation expenses.

120.    Making lateral hires from competitors can be an efficient way to identify candidates, because these employers know that these employees possess the requisite training and experience. By contrast, hiring entry-level candidates directly out of school or from a different industry requires the hiring company to invest significant resources in identifying, assessing, and training new employees. For these reasons and others, lateral hiring is a key force in making markets competitive. Thus, poaching enables a company to take advantage of the efforts its rival has expended in soliciting, interviewing, and training the candidate.

121.    In a competitive market, the high demand and low supply of qualified engineers would give each Defendant an incentive to poach Engineers from its competitors. The Defendants' refusal to do so reflects their determination to act against their individual self-interests.

### F.    Harm to Competition and Antitrust Injury

122.    In the absence of their illegal agreement not to poach one another's employees, Defendants would compete for the limited number of qualified Engineers available to fill open positions. This competition would lead to increases in salary, benefits, and other measures of compensation that Engineers would receive. Instead, the agreement *not* to compete has harmed Engineers by suppressing their compensation, a classic antitrust harm.

### 1. Engineers' Compensation Would be Higher in a Competitive Market

123. As noted above, the supply of qualified Engineers is limited, but demand for them is high. Basic principles of economics dictate that in that circumstance, employers should compete with one another to attract talent. In a properly functioning market, that competition drives up compensation in at least three ways.

124. First, while employers would like to pay the lowest compensation possible, competition for a limited pool of candidates requires employers to improve their offers, which in turn improves employees' ability to negotiate for better salaries and other terms of employment. A competitor may need to increase the compensation it is offering to a candidate in order to entice him/her to leave his/her current position and overcome the transaction costs involved with switching.

125. Second, retaining valuable employees enables companies to avoid the costs of finding replacements. If companies know that their employees are subject to poaching, they are more likely to increase compensation *before* employees receive competing offers, in order to maintain high levels of morale and productivity and mitigate the risk of their leaving. Relatedly, *after* an employee has received a competitive offer, the individual's current employer may increase his/her compensation package in an effort to retain him/her. This can be disruptive, creating pressures to raise compensation for other employees in order to maintain "internal equity." In short, employers have an incentive to increase compensation preemptively to avoid lateral departures.

126. Third, competition facilitates price discovery. Basic free market economics dictates that pricing transparency enables market participants to weigh supply and demand based on a full universe of information, leading the market to its natural market clearing price. Applied

to this context, an employee who gets recruited by a competitor gains important information about the value of her services in the market.

> **2.    The No Poach Agreement Had the Anticompetitive Effect of Reducing Compensation for All Members of the Class**

127.    As noted above, because Defendants' conduct was illegal per se, Plaintiff has no obligation to plead the anticompetitive effects of that conduct. Nonetheless, the intent of the No Poach Agreement was to suppress Engineers' compensation, and it worked. The conspiracy has had anticompetitive effects without any countervailing procompetitive benefits. The injury to Engineers—namely, suppression of their compensation—is an injury of the type that the antitrust laws were meant to punish and prevent.

128.    The No Poach Agreement denied Plaintiff and Class members opportunities to seek improved compensation or other professional opportunities. Although they are in high demand, aerospace engineers' skills are highly specialized and not easily transferable to other fields. As a result, they are not able to evade Defendants' collusive conduct by seeking employment in a different industry. Instead, they have no choice but to accept the suppressed compensation offered by Defendants.

129.    The conspiracy prevented price discovery that would enable compensation for Engineers' services to settle at a market clearing price. With no visibility into the true market value of their services, Engineers were not aware that their compensation is lower than the competitive rate. This lack of transparency empowered employers to keep salaries and other measures of compensation low.

130.    Defendants' illegal conduct suppressed not only the compensation of workers who considered moving to another employer—it suppressed the compensation for *all* Engineers that Defendants employed during the Class Period. Through the No Poach Agreement,

Defendants targeted employees most likely to command disruptive increases, shutting off the free flow of information and dodging the need to increase pay—either preemptively or reactively.

131.    Although the DOJ is currently prosecuting the individual defendants for their roles in the No Poach Agreement, this class action is the only means to redress the harm that Plaintiff and Class members have suffered in the form of illegally suppressed compensation.

### 3.    The No Poach Agreement is Per Se Illegal

132.    Defendants' No Poach Agreement is an unreasonable restraint on competition entered into by horizontal competitors in the market for the services of Engineers. It is per se illegal both as a matter of law and as a matter of the stated policy of the nation's antitrust enforcers.

133.    In 2016, the DOJ and FTC issued joint guidance regarding horizontal agreements among competitors not to poach one another's employees. According to the agencies, such agreements "eliminate competition in the same irredeemable way as agreements to fix product prices or allocate customers, which have traditionally been criminally investigated and prosecuted as hardcore cartel conduct."

134.    In 2019, the DOJ further explained that,

> When companies agree not to hire or recruit one another's employees, they are agreeing not to compete for those employees' labor. Robbing employees of labor market competition deprives them of job opportunities, information, and the ability to use competing offers to negotiate better terms of employment. Under the antitrust laws, the same rules apply when employers compete for talent in labor markets as when they compete to sell goods and services.

135.    The recent criminal indictments of Patel, Harvey, Wasan, Houghtaling, Edwards and Prus confirm that per se treatment is appropriate for the conduct at issue in this case.

136.    Even if the Court were to apply a "quick look" or "rule of reason" analysis, the No Poach Agreement still violates the antitrust laws. Accordingly, in the alternative, Plaintiff pleads that Defendants' No Poach agreement violated Section 1 of the Sherman Act under both a quick look analysis and the rule of reason.

137.    Courts have recognized that in some circumstances, it need not engage in the full rule of reason analysis, even if conduct is not per se illegal. Instead, a court may be able to determine based on nothing more than a "quick look" that the restraint of trade is an unreasonable one. As the Supreme Court has explained, some agreements among competitors so obviously threaten to reduce output and raise prices—or, in contexts like this one, *suppress* prices—that they might be condemned after only a quick look.

138.    That will be the case here. Because the No Poach Agreement obviously suppressed Engineers' compensation below a competitive level, it can be condemned after only a quick look.

139.    Even if neither the per se nor quick look standards apply, the No Poach Agreement is nonetheless unlawful under the rule of reason. Courts have described the rule of reason as a fact-specific assessment of market power and market structure aimed at assessing the challenged restraint's actual effect on competition. It involves a three-step, burden-shifting framework. First, plaintiff must show that the restraint had an anticompetitive effect. Second, defendants may show procompetitive justifications for the conduct. Third, plaintiff can overcome the defendants' showing, and establish liability, if it can prove that a viable and substantially less restrictive, yet equally effective, alternative to the conduct exists.

140.    Under the rule of reason analysis, Defendants are liable because their agreements had anticompetitive effects. The No Poach Agreement reduced competition for Engineers, and

thus reduced their salaries, benefits, and other forms of compensation; their professional opportunities and mobility; and their freedom of choice about where to work. The No Poach Agreement had no countervailing procompetitive benefits, as outlined above. For that reason, the analysis would never even reach the third step.

141.    The No Poach Agreement is a per se unlawful restraint of trade under the federal antitrust laws and injured Plaintiff and Class members. The clear evidence of Defendants' intent in designing the No Poach Agreement to suppress Engineers' compensation further supports this conclusion.

## V.    EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS AND FRAUDULENT CONCEALMENT

142.    Any applicable statute of limitations was tolled by the discovery rule and the doctrine of fraudulent concealment until December 9, 2021, when DOJ filed the Affidavit.

143.    Until that filing, Plaintiff and Class members had neither actual nor constructive knowledge of the pertinent facts constituting their claims for relief asserted herein.

144.    Plaintiff and Class members were kept ignorant by Defendants of crucial information required for the prosecution of their claims, without any fault or lack of diligence on their part. No information, actual or constructive, was ever made available to Plaintiff and members of the Class that they were being injured by Defendants' conduct, nor was any such information available in the public domain. Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of due diligence, the existence of Defendants' wrongdoing.

145.    The No Poach Agreement was first and foremost a verbal or "handshake" agreement, and Defendants made conscious efforts to avoid reducing the agreement to writing. Nonetheless, a handful of emails have emerged that confirm the existence of the Agreement. But

Plaintiff, Class members and the public did not become aware of those emails, and otherwise had no reason to know Defendants had conspired to violate the antitrust laws, until December 9, 2021.

146.     Although some employees of Defendants suspected something like the Agreement was frustrating their professional opportunities and suppressing their compensation, Plaintiff and most Class members were in the dark. DOJ Aff. ¶ 54. In particular, for those Class members who did not even seek new positions, they had no reason to suspect the existence of the No Poach Agreement or that it was suppressing their salaries.

147.     Defendants and co-conspirators took various steps to conceal the No Poach Agreement, including by:

    a.     minimizing any mention of the agreement in writing;

    b.     minimizing the number of people who knew about the No Poach Agreement, including by restricting attendance at meetings at which they discussed the agreement;

    c.     agreeing that the agreement would remain an unwritten understanding and would not be reflected in written agreements among them; and

    d.     providing false and misleading information to Engineers about the No Poach Agreement and their ability to work for rivals, including by informing Engineers that non-compete agreements—rather than the No Poach Agreement— limited their mobility.

Indictment ¶ 29.

148.     As noted above, in September 2011, Harvey wrote in an email to Patel and others, "Following Mahesh's previous counsel, I am not going into detail in writing" about the No Poach Agreement. Indictment ¶ 29(e).

149.     In January 2015, a QuEST manager summarized for Harvey and others a discussion with Houghtaling about the No Poach Agreement, stating, "While I want you to be

informed, I would rather not have any other folks know where this info came from. I request that this email not be forwarded." Indictment ¶ 29(f).

150.    In April 2017, after a manager at QuEST complained to Patel that Cyient had poached QuEST employees, Patel summoned two QuEST managers and two Cyient managers, including Edwards, for a "private discussion" in his office. Indictment ¶ 29(g).

151.    Until the DOJ revealed the existence of the No Poach Agreement in the December 9, 2021 Affidavit, Plaintiff and the Class had no means of learning about the conspiracy. Even if they had suspicions, the conspirators' commitment to keeping the No Poach Agreement secret would have defeated any reasonable effort to uncover it.

152.    Accordingly, any applicable statute of limitation has been tolled by operation of the discovery rule and the doctrine of fraudulent concealment, and Defendant is estopped from relying on any statute of limitation defense in this action.

## VI.    CLASS ACTION ALLEGATIONS

153.    Plaintiff brings this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Class is defined as:

> All persons employed in the United States as engineers or other skilled workers by the Entity Defendants or their parents, subsidiaries or affiliates from 2011 to 2019 (the "Class Period"). Excluded from the Class are senior executives and personnel in the human resources and recruiting departments of the Entity Defendants. The "United States" includes all fifty states, the District of Columbia, and all U.S. territories.

154.    While Plaintiff does not know the exact number of members of the Class, Plaintiff believes the Class contains hundreds, if not thousands, of members. The Class is so numerous that individual joinder of all members is impracticable.

155.    The Class is ascertainable either from Defendant's records or through self-identification in the claims process.

156.    Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to all members of the Class, hereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

(a)  Whether Defendants agreed not to hire, recruit, solicit or contact each other's employees;

(b)  Whether such agreements were *per se* violations of the Sherman Act;

(c)  Whether Plaintiff and Class members discovered the unlawful conduct within the tolling period and could not have discovered it sooner through the exercise of reasonable diligence;

(d)  Whether and the extent to which Defendants' conduct suppressed salaries, benefits and other forms of compensation below competitive levels;

(e)  Whether Plaintiff and Class members suffered injury as a result of Defendants' anticompetitive conduct;

(f)  Whether any such injury constitutes antitrust injury;

(g)  The nature and scope of injunctive relief necessary to restore a competitive market; and

(h)  The measure of damages suffered by Plaintiff and the Class.

157.    Plaintiff's claims are typical of the claims of the members of the Class as they arise out of the same course of conduct and the same legal theories, and they challenge

Defendants' conduct with respect to the Class as a whole. Plaintiff will fairly and adequately protect the interests of the Class.

158.    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

159.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

160.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

161.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

162.    Injunctive relief is appropriate with respect to the Class as a whole because Defendants acted on grounds generally applicable to the Class.

## FIRST CLAIM FOR RELIEF
## (VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1)

163.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

164.    Defendants created, maintained, monitored and enforced the unlawful horizontal No Poach Agreement described herein. The No Poach Agreement unreasonably restrained trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

165.    As a horizontal agreement to restrain trade among competitors, the No Poach Agreement is illegal per se. As such, there is no need to assess Defendants' market power or the anticompetitive effects of their conduct.

166.    In the alternative, the No Poach Agreement is also illegal under a quick look or rule of reason analysis.

167.    Defendants collectively possess market power in the relevant market.

168.    Defendants' conduct had anticompetitive effects in the relevant market, including but not limited to:

    (a)  Restraining competition among Defendants for the services of Engineers;

    (b)  Suppressing salaries, benefits and other forms of compensation for Engineers; and

    (c)  Reducing or eliminating Engineers' professional opportunities, mobility and choices.

169.    The No Poach Agreement has no procompetitive benefits, justifications, or efficiencies. To the extent any such procompetitive benefits exist, the anticompetitive effects outweigh such benefits.

170.    The acts done by Defendants as part of, and in furtherance of, their agreements, understandings, contracts, combinations, or conspiracies were authorized, ordered, or done by

their respective senior executives while actively engaged in the management of Defendants'
affairs.

171.    Defendants' conspiracy injured Plaintiff and other Class members by lowering
their compensation and depriving them of free and fair competition in the market for their
services, which are injuries of the type the antitrust laws were intended to redress.

172.    Plaintiff and Class members seek monetary damages, including treble damages,
attorneys' fees, costs of suit, and injunctive and declaratory relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.    For an order certifying this lawsuit as a class action pursuant to Rules 23(a),
(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as Class
Representative and Plaintiff's counsel as Class Counsel;

B.    For a declaration that Defendants engaged in a trust, contract, combination, or
conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and
that Plaintiff and Class members have been damaged and injured in their business as a result of
this violation;

C.    For a declaration that the alleged conduct be adjudged and decreed to be a per se
violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, or, in the alternative, a violation of
Section 1 of the Sherman Act, 15 U.S.C. § 1, under the quick look or rule of reason frameworks;

D.    For a judgment awarding Plaintiff and the Class treble damages, against
Defendants for their violations of the Sherman Act, together with pre-judgment and post-
judgment interest at the maximum rate allowable by law or allowed in equity;

E.    For a judgment imposing a permanent injunction prohibiting Defendants from
hereafter agreeing not to hire, recruit, solicit or contact each other's employees, to notify each

other of offers extended to potential  hires, or not to make counteroffers, or engaging in unlawful

communications regarding compensation and agreeing with other companies about

compensation ranges or any other terms of employment;

      F.     For a judgment entered against Defendants in favor of Plaintiff and the Class for

restitution and disgorgement of ill-gotten gains as allowed by law and equity;

      G.     For an order awarding Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

      H.     For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial for all

claims and issues so triable.

Dated: January 12, 2022                    */s/ Robert M. Frost, Jr.*

Robert M. Frost, Jr. (Bar No. CT19771)
**FROST | BUSSERT LLC**
350 Orange Street, Suite 100
New Haven, CT 06511
Tel: (203) 495-9790
Fax: (203) 495-9795
rmf@frostbussert.com

Kellie Lerner (*pro hac vice* forthcoming)
William V. Reiss (*pro hac vice* forthcoming)
David B. Rochelson (*pro hac vice* forthcoming)
**ROBINS KAPLAN LLP**
900 Third Avenue, Suite 1900
New York, NY  10022
Tel: (212) 980-7400
Fax: (212) 980-7499
klerner@robinskaplan.com
wreiss@robinskaplan.com
drochelson@robinskaplan.com

Peggy J. Wedgworth (*pro hac vice* forthcoming)
Elizabeth McKenna (*pro hac vice* forthcoming)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
405 East 50th Street
New York, New York 10022
Tel: (212) 594-5300
Fax: (212) 868-1229
pwedgworth@milberg.com
emckenna@milberg.com

*Attorneys for Plaintiff and the Putative Class*